**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL MINNIFIELD (#R-55489),　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　)　　　Case No. 21-cv-4982
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　Hon. Steven C. Seeger
　　　　　　　　　　　　　　　　　　)
WARDEN DAVID GOMEZ, *et al.*,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　)
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Michael Minnifield was incarcerated at the Stateville Correctional Center when another inmate set a cell on fire. Minnifield was evacuated and evaluated by medical personnel. Then, he returned to the same cell.

Minnifield wanted to move cells. His cell wall was still covered in soot, and he had concerns about the lack of sprinklers and smoke alarms at the prison. So, he wrote to Warden David Gomez and Major Randy Malkowski.

Warden Gomez and Major Malkowski never responded to the letter. But Minnifield's concerns about future fires proved prescient. The very next day, a different inmate, Young, set his cell ablaze. For the second time in as many days, Minnifield suffered smoke inhalation and was evacuated from his cell.

According to Minnifield, Young had asked Lieutenant Daniel Gray for a crisis team – and threatened to burn the building down – shortly before starting the fire. But Lieutenant Gray didn't send Young a crisis team. And Young followed through on his threats.

Frustrated by the fires, Minnifield sued Warden Gomez, Major Malkowski, and Lieutenant Gray, alleging violations of the Eighth Amendment. Minnifield claims that Warden

Gomez and Major Malkowski acted with deliberate indifference to inadequate fire safety procedures in the prison. He claims that Lieutenant Gray failed to protect him from Young.

After discovery, Defendants moved for summary judgment.

For the reasons explained below, Defendants' motion for summary judgment is granted.

## Non-Compliance with the Local Rules

Before diving into the facts, the Court must start with the Local Rules. The Local Rules establish orderly procedures for litigation in this district. They set out procedures about how to move for summary judgment, and about how to respond to a motion for summary judgment. The punchline is that Minnifield did not comply with the Local Rules.

Local Rule 56.1 governs motions for summary judgment, and responses. A party moving for summary judgment must submit a memorandum of law and a statement of material facts. *See* L.R. 56.1(a). The movant must submit a statement of facts that lists each fact, one by one, in "concise numbered paragraphs." *See* L.R. 56.1(d)(1). A citation to the record must support each fact. *See* L.R. 56.1(d)(2).

In response, the opposing party must file (1) a memorandum of law; and (2) a response to the "LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)." *See* L.R. 56.1(b). The non-movant's response must "consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement of facts. *See* L.R. 56.1(e)(1). If the non-movant disagrees with any of the movant's facts, the non-movant must cite record evidence supporting its position. *See* L.R. 56.1(b)(3)(C); *see also* L.R. 56.1(e)(3).

Basically, the Local Rules require the non-movant to respond, paragraph by paragraph, to the facts in the movant's statement of facts. And if the non-movant disagrees with any of the movant's facts, the non-movant must provide record evidence to back up its position. Summary

judgment is show-me-the-money time. After reviewing the response to the statement of facts and the record evidence, the Court can determine if there's any *there* there.

The Local Rules also allow the non-moving party to supplement the record with additional facts. The non-moving party must file a statement of additional facts and "attach[ ] any cited evidentiary material." *See* L.R. 56.1(b)(3).

Many cases involve non-lawyers. For laypeople, lawsuits are often unfamiliar terrain. The Local Rules recognize that reality and give extra assistance to *pro se* parties. Under Local Rule 56.2, parties must serve *pro se* litigants with a special notice. *See* L.R. 56.2.

The Local Rule 56.2 Notice offers *pro se* parties a step-by-step guide on how to navigate the summary judgment process. *See id.* It provides unrepresented parties with "clear instructions about what they need to file, and how they need to do it." *See Zhang v. Schuster*, 2022 WL 615015, at *1 (N.D. Ill. 2022). The notice also warns *pro se* litigants that, if they fail to respond to a fact offered and supported by the movant, the judge may deem the fact admitted. *See* L.R. 56.2.

The Court can require complete compliance with the Local Rules, even for *pro se* parties. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven pro se litigants must follow procedural rules.").

Following rules can be tricky, especially for non-lawyers. Nonetheless, the Local Rules play a critical role in allowing district courts to assess whether a case deserves to go to trial. District courts have hundreds of motions in hundreds of cases. The Local Rules speed up the review process and allow courts to get rulings to litigants more quickly.

Defendants followed the rules. They filed a motion for summary judgment, a supporting brief, and a statement of undisputed facts. That statement of facts included 25 numbered paragraphs. *See* Defs.' Statement of Facts (Dckt. No. 60).

Defendants also filed a Local Rule 56.2 Notice providing Minnifield (who is *pro se*) with information on how to respond. *See* L.R. 56.2 Notice (Dckt. No. 62). In a similar vein, the Court reminded Minnifield "that he must comply with the Local Rules, especially Local Rule 56.1." *See* 10/2/23 Order (Dckt. No. 58).

Rather than submitting a separate memorandum and response to Defendants' statement of facts, Minnifield filed an omnibus response. *See* Pl.'s Resp. (Dckt. No. 66). That response spans 83 pages. *Id.*

The first nine pages contain a response to Defendants' statement of facts. *See id.* at 1–9. The next two pages are titled "Statement of Additional Facts." *Id.* at 10–11.

However, Minnifield's additional facts do not only appear in the statement of additional facts. Instead, he offers additional facts throughout his omnibus filing, including in a nine-page document titled, "Plaintiff's declaration in opposition to defendants['] motion for summary judgment." *Id.* at 20–28. That document contains numerous factual allegations without citations to the record. *See, e.g.*, *id.* at 20.

In a similar vein, Minnifield filed a document titled "Plaintiff opposing defendants['] motion for summary judgement," which contains other factual assertions. *Id.* at 80–83.

Minnifield attached various exhibits throughout his filing. Most of those exhibits, such as reports prepared during the investigation of the fire and Minnifield's medical records, are (at least partly) admissible. *See, e.g.*, *id.* at 54–66.

4

Minnifield cites one exhibit that is entirely inadmissible: his complaint. *Id.* at 44–50. "[M]ere allegations" in a complaint are not evidence. *See Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006); *see also MCM Mgmt. Corp. v. Hudson Ins. Co.*, 645 F. Supp. 3d 866, 869 n.2 (N.D. Ill. 2022) ("Where one party supports a fact with admissible evidence (*i.e.*, not complaint allegations) and the other party fails to controvert the fact with citation to admissible evidence (*i.e.*, not complaint allegations), the Court deems the fact admitted.").

In addition, Minnifield offers several "affidavits." *See, e.g.*, Pl.'s Resp., at 29–31, 51–52 (Dckt. No. 66). A party may submit an affidavit or declaration in support or opposition of a summary judgment motion. *See* Fed. R. Civ. P. 56(c)(1)(A).

However, a witness statement does not become an "affidavit" simply because it is named that way. Affidavits must be "sworn to before someone qualified to administer oaths." *See G&G Closed Cir. Events, LLC v. Castillo*, 2017 WL 1079241, at *7 (N.D. Ill. 2017).

By contrast, a declaration doesn't require notarization. Instead, it must contain a statement that confirms "under penalty of perjury" that the information is "true." *See* 28 U.S.C. § 1746. The statute even provides magic words: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." *Id.*

One of the "affidavits" Minnifield cites (David Wynter) contains a notary public's seal. *See* Wynter Aff. (Dckt. No. 66, at 29 of 83). The Wynter affidavit is an admissible affidavit.

By contrast, the "affidavit" of Michael Johnson is really a declaration – it doesn't include a seal, but it does contain the magic language of section 1746. *See* Johnson Decl. (Dckt. No. 66, at 31 of 83). Likewise, the "affidavit" of Robert Morris satisfies the requirements for a declaration, not an affidavit. That document is not notarized. *See* Morris Decl. (Dckt. No. 66, at 51–52 of 83). However, it contains a certification under section 1746. *Id.* at 52 of 83.

5

In the end, the Court can consider the statements of Wynter, Johnson, and Morris in ruling on Defendants' motion for summary judgment. Wynter's statement is an affidavit, and the other two statements are declarations. The Court can consider both types of statements when ruling on a summary judgment motion. By contrast, the Court can't and won't consider any statements contained in Minnifield's complaint.

Minnifield's omnibus response also contains his memorandum in opposition to Defendants' motion for summary judgment. *See* Pl.'s Resp. (Dckt. No. 66, at 67–79 of 83). That memorandum includes citations to case law and detailed responses to the arguments set forth by Defendants.

Defendants urge the Court to deem their statement of facts admitted given Minnifield's non-compliance with Local Rule 56.1. *See* Defs.' Reply, at 2 (Dckt. No. 68). Although the Court agrees that Minnifield didn't perfectly adhere to the rules, the Court declines to simply deem all of Defendants' facts admitted.

That said, the Court will not consider a fact disputed unless Minnifield has offered *admissible* evidence in support of his position. If he simply cited his complaint, the Court will deem the fact admitted. If he merely cited hearsay, the Court will deem the fact admitted. If he failed to offer any record citation in support of his position, the Court will deem the fact admitted. No genuine dispute of material fact exists unless there is admissible evidence on both sides of the evidentiary scale.

In addition, this Court will not consider any factual allegations that do not appear in Defendants' statement of facts, Minnifield's response to the statement of facts, Minnifield's statement of additional facts, and Defendants' response to the statement of additional facts. In other words, the Court will not consider any stray facts that appear in other documents (only).

After reviewing the materials, the Court can tell that Minnifield gave it his best shot. He put time and care into formulating his response. The Court understands the challenges that come with litigating *pro se*, particularly for incarcerated litigants. Still, the Local Rules apply to everyone. *See Robinson v. Hayes*, 2022 WL 16856391, at *2 (N.D. Ill. 2022).

Local Rule 56.1 provides a mechanism for streamlining the Court's review of the facts. This Court won't do additional sleuthing because of a party's non-compliance. If a fact isn't in the right place, it's not part of the record. But the Court won't call the whole game in Defendants' favor, either, without taking a deeper look at Minnifield's submissions.

All of this is a long way of saying a simple point. The Court will require the parties to play by the rules. And if they don't, the Court will call them out. With that windup, the Court turns to the facts.

## Background

### *The Parties*

Plaintiff Michael Minnifield is an inmate in custody of the Illinois Department of Corrections. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 66). In January 2020, Minnifield was housed at X-House at Stateville Correctional Center. *Id.*

X-House spans two floors. *Id.* at ¶ 8. It consists of four galleries with an east and west wing on both levels. *Id.* The galleries are named for direction and level as: Upper West, Lower West, Upper East, and Lower East. *Id.* Minnifield stayed in the "Upper West" gallery. *Id.* at ¶ 7. For those following along, "Upper West" is on the top floor, on the west side of X-House.

The Upper West gallery contains eight cells. *See* Minnifield Dep., at 25:16 – 26:2 (Dckt. No. 60-1). There's only one way to enter or exit the gallery. *Id.* The cells are on the right side when you walk in. *Id.* Windows are on the left side. *Id.* And showers are in the back. *Id.*

Defendant Daniel Gray was a correctional lieutenant working second shift (meaning from 3:00 p.m. to 11:00 p.m.) at Stateville in January 2020. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 66). Defendant Randy Malkowski was a shift commander on first shift (meaning from 7:00 a.m. to 3:00 p.m.). *Id.* at ¶ 4. Defendant David Gomez became Stateville's warden in February 2020 (a month after the incident in question). *Id.* at ¶ 2.

***The First Fire***

On the evening of January 8, 2020, an inmate started a fire in X-House Lower West (*i.e.*, in the gallery located on the first floor of X-House's west wing). *Id.* at ¶ 9. Minnifield was evacuated after the fire. *Id.* at ¶ 10. He returned to his cell after receiving an evaluation from medical personnel. *Id.*

After the January 8 fire, Minnifield wrote a letter to Warden Gomez and Major Malkowski requesting a move to another segregation housing unit. *Id.* at ¶ 11. He explained that there was soot on the wall of his cell. *Id.* In addition, he wrote that X-House lacked water sprinklers or smoke detectors. *Id.*

Minnifield never received a response to his letter. *Id.* at ¶ 12. He wasn't moved before the next day, January 9. *Id.*

Warden Gomez and Major Malkowski submitted declarations denying that they received Minnifield's letter, let alone received it the day after the first fire. According to Warden Gomez, he did not receive any letter from Minnifield in January 2020 "asking to be moved from his cell or raising complaints about fire safety." *See* Gomez Decl., at ¶ 4 (Dckt. No. 60-3). Major Malkowski also contends that he "did not receive" a letter from Minnifield asking to be moved after the January 8 fire. *See* Malkowski Decl., at ¶ 6 (Dckt. No. 60-5).

Minnifield disputes the notion that Warden Gomez and Major Malkowski never received his letter.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 66).  He cites a few documents, but they do not support the notion that they received his letter.

For example, Minnifield cites portions of his deposition testimony that merely stand for the proposition that he *sent* the letter – not that anyone *read* it.  *See* Minnifield Dep., at 13:11-17, 26:16 – 27:8 (Dckt. No. 60-1).  Similarly, Minnifield cites a portion of Major Malkowski's declaration that simply states that Major Malkowski worked as first shift commander in X-House in January 2020.  *See* Malkowski Decl., at ¶¶ 1–3 (Dckt. No. 60-5).

The record lacks evidence about the speed of delivery of the prison mail.  Even assuming that the letter made it to Major Malkowski eventually, Minnifield does not cite Stateville or IDOC policy to support an inference that Major Malkowski would have received the letter by the next day (January 9).  For instance, Minnifield does not indicate the existence of an official policy requiring next-day review of prisoner complaints.

Basically, the exhibits cited by Minnifield fail to create a genuine issue of material fact about whether Warden Gomez and Major Malkowski received and reviewed his letter by January 9, meaning the day after the fire.

Sometimes the act of sending a letter, plus evidence about the pattern of practices of delivery, could give rise to an inference of eventual receipt.  For example, evidence that someone put something in the U.S. Mail could give rise to an inference that a letter was delivered to the addressee.  It is not a necessary inference.  But it is a possible inference (if the person remembered the stamp).

But an inference of delivery depends on evidence about the reliability of the means of delivery.  Putting a letter in the hands of a mail carrier might give rise to an inference of delivery.

But putting a letter in the hands of a kid down the block, with a $5 tip in hand, probably wouldn't.

There is a timing issue, too. Evidence of putting a letter in the prison mail on Day 1 cannot give rise to an inference that the letter was received on Day 2, unless there is other evidence in the record. That's pretty speedy, and the record would need to contain evidence that the mail in the prison operated with that level of alacrity.

Delivery is not the same thing as receipt. And receipt is not the same thing as review. That is, evidence of sending something is not the same thing as evidence of receipt, and evidence of receipt is not the same thing as evidence that someone read it. Lots of people get mail, and read it later.

Overall, Minnifield came forward with evidence that he put a letter in the prison mail system on January 8. But Minnifield has not come forward with evidence that the letter was received and read by January 9. On this record, that inference is a bridge too far.

**_The Second Fire_**

At about 7:00 p.m. on January 9, 2020 (meaning, the day after the first fire), an inmate named "Young"[1] started a fire in X-House on the Upper West gallery. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 14 (Dckt. No. 66). Young was not the inmate who set the fire the night before. *Id.*

Lieutenant Gray (the correctional lieutenant) was working the second shift when Young started the fire. *Id.* at ¶ 15. Major Malkowski had worked the first shift that day but was off the clock when the fire began. *Id.* at ¶ 16.

---

[1] After searching the record – and doing some judicial sleuthing on CM/ECF using Young's inmate number – the Court could not find Young's first name.

Minnifield testified that – a couple hours before the fire – he overheard Young ask for a crisis team and threaten to start a fire.  *Id.* at ¶ 17.

Specifically, Minnifield testified that he overheard Young tell Lieutenant Gray that he was "hearing voices" and needed to "see crisis to talk to somebody" because he was "thinking about killing" himself.  *See* Minnifield Dep., at 12:8-12 (Dckt. No. 60-1).  According to Minnifield, Young was yelling "I'm going to burn this bitch down, I'm going to burn it to a crisp, I'm going to burn it and everybody is going to die."  *Id.* at 12:15-18.

Minnifield testified that he asked Lieutenant Gray to get Young a crisis team, but Gray declined.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 66).

Other inmates recalled a similar sequence of events to what Minnifield described.  In an affidavit, David Wynter (Young's cellmate) stated that he heard Young ask Lieutenant Gray for a crisis team at about 5:00 p.m. on the night of the fire.  *See* Wynter Aff. (Dckt. No. 66, at 29 of 83).  Wynter asked Lieutenant Gray to move him out of the cell, but Gray said "no."  *Id.*

Michael Johnson, another inmate, declared that he heard Young yelling for hours that he planned to kill himself and needed a crisis team.  *See* Johnson Decl., at ¶ 5 (Dckt. No. 66, at 30 of 83).  Johnson said that multiple correctional officers ignored Young's pleas.  *Id.*

Additionally, in the incident report prepared by Lieutenant Gray after the fire, Gray wrote that Young "stated . . . that he requested a Crisis Team and [Gray] denied him."  *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6).

Lieutenant Gray reported a different sequence of events.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 66).  Lieutenant Gray declared that he "did not receive any request by individual Young for a crisis team prior to the fire on January 9" and did not "receive a request for a crisis team for Young by anyone else," either.  *See* Gray Decl., at ¶ 10 (Dckt.

No. 60-4). In a report prepared after the fire, Lieutenant Gray wrote that he "was present on the gallery at approximately 6:23pm" but "inmate Young did not request a Crisis Team at that time." *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6).

According to Lieutenant Gray, Behavioral Health Technician Puckett went to Young's cell at 4:38 p.m. on the day of the fire. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 66); *see also* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6). But Young "refused to leave his cell and be seen." *See* 1/9/20 Incident Report, at 1. So, Puckett left the unit at 5:00 p.m. *Id.* at 1–2.

Lieutenant Gray responded to the fire about two hours later. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 66). When he arrived at Upper West, he "observed smoke emitting from an unknown cell." *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6).

Then, Lieutenant Gray called a "Code 8" for a fire. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 66). He ordered a correctional officer to obtain a fire extinguisher from the armory. *Id.*

When Lieutenant Gray got to the cell shared by Young and Wynter, he discovered "a mattress and debris [on] fire on the floor at the front of the cell." *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6). After the correctional officer returned with a fire extinguisher, Lieutenant Gray put out the fire. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 66).

Lieutenant Gray then ordered X-House staff to restrain the inmates on Upper West and evacuate them to the Unit X Group Room for assessment by medical staff. *Id.* at ¶ 24.

X-House has fire extinguishers and water hoses. *See id.* at ¶ 25. The fire extinguishers are kept in the armory area (which is apparently on the first floor of X-House). *See* Malkowski Decl., at ¶ 7 (Dckt. No. 60-5). Minnifield testified that his floor lacked water sprinklers or

smoke alarms. *See* Minnifield Dep., at 13:1-20 (Dckt. No. 60-1). Robert Morris, another inmate located at X-House during the fire, declared that "it was difficult for staff to answer and properly respond" to the fire because of the lack of "smoke detectors, fire sprinklers, and or fire extinguishers etc. etc." *See* Morris Decl. (Dckt. No. 66, at 51 of 83).

Minnifield suffered "chest pains, back pain, headaches, nightmares, struggling to breathe, throat pains" and eye pain from the fire. *See* Minnifield Dep., at 22:15-16 (Dckt. No. 60-1). He received various treatment, including nasal sprays, inhalers, throat lozenges, pain pills, muscle relaxers, creams, eye drops, and Prazosin for his nightmares. *Id.* at 23:14-18.

### *This Lawsuit*

After experiencing two fires in as many days, Minnifield sued Lieutenant Gray, Warden Gomez, and Major Malkowski under 42 U.S.C. § 1983. *See* Cplt., at 2 (Dckt. No. 1). Because Minnifield is a *pro se* prisoner, this Court prescreened his complaint under 28 U.S.C. § 1915A. *See* 4/11/22 Order, at 1 (Dckt. No. 14).

The Court concluded that Minnifield had adequately alleged an Eighth Amendment deliberate indifference claim against Lieutenant Gray for failing to protect him from the January 9 fire. *See id.* at 3–4. In addition, the Court concluded that Minnifield could "proceed on a potentially systemic claim of insufficient fire safety in X-House at Stateville against Defendants Gomez and Malkowski." *Id.* at 4.

Discovery came and went. Then, Defendants moved for summary judgment. *See* Mtn. for Summ. J. (Dckt. No. 59). Defendants argue that Warden Gomez and Major Malkowski "were not personally involved in any constitutional violation, and there is no evidence that Stateville was insufficiently prepared in the event of a fire." *Id.* at 2.

13

Defendants believe that Lieutenant Gray "was not deliberately indifferent to Plaintiff's Eighth Amendment rights by supposedly denying another inmate's request for a crisis team, and [he] responded reasonably to the known risk of a fire once the fire was started." *Id.* Also, they assert that Lieutenant Gray is entitled to qualified immunity. *Id.*

After reviewing Defendants' filings, Minnifield moved to voluntarily dismiss Warden Gomez from the suit. *See* Pl.'s Mtn. to Withdraw Def. Gomez (Dckt. No. 64). Minnifield had not realized that Gomez was not warden at the time of the fires. *See id.* at 2. The Court granted Minnifield's motion. *See* 10/31/23 Order (Dckt. No. 65).

So, Warden Gomez is no longer in the case. Two Eighth Amendment deliberate indifference claims remain: the claim against Lieutenant Gray about his response to the fire on January 9 (meaning the second fire), and the claim against Major Malkowski about insufficient fire safety at X-House.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

14

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Eighth Amendment prohibits cruel and unusual punishment. *See* U.S. Const. amend. VIII. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

"Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (citation omitted). The standard has an objective component and a subjective component. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020). The objective component requires an exposure to an "objectively serious harm." *See id.*; *Farmer*, 511 U.S. at 837–38. The subjective component requires that the defendant "knows facts from which he could infer that a substantial risk of serious harm exists and . . . actually draw[s] the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

Two Eighth Amendment deliberate indifference claims remain in this case. One claim is about the failure to protect Minnifield from the fire set by Young on January 9. That claim is

15

against Lieutenant Gray. The other claim is about the fire safety precautions at X-House. That claim is against Major Malkowski.

The Court will take up the claims in the reverse order. That is, the Court will first consider whether Minnifield's claim against Major Malkowski survives summary judgment. Then, the Court will assess his claim against Lieutenant Gray. Given that Minnifield voluntarily dismissed Warden Gomez from the suit, the Court will not address the claim against Gomez.

## I. The Deliberate Indifference Claim Against Major Malkowski

Defendants argue that the deliberate indifference claim against Major Malkowski fails because Major Malkowski lacked personal responsibility for any constitutional violation. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 4 (Dckt. No. 61).

Officers are liable under section 1983 only if they had "some personal involvement in the alleged constitutional deprivation." *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019); *see also Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). A theory of respondeat superior does not suffice – a plaintiff must show that the defendant's own conduct violated the Constitution. *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (citation omitted).

Deliberate indifference requires awareness about the problem. *See Love v. Illinois Dep't of Corr.*, 2020 WL 1237200, at *6 (N.D. Ill. 2020). For a supervisor to be liable for a subordinate's constitutional violation, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (citations omitted).

A high-ranking officer "can be expected to know of or participate in creating systemic, as opposed to localized" constitutional violations. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996); *see also Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015). But that principle has

16

limits, and courts must apply it with great care. After all, a warden has 1,001 things on his plate at any one time, and it is all too easy to say after the fact that someone else should have known something. Courts must not apply an expectation of knowledge too broadly, lest the assumption become a back-door route to respondeat superior liability.

"There is no bright-line test that determines when a condition is systemic rather than localized, but courts have found conditions to be systemic when they are unlikely to affect only one inmate in isolation." *Human Rights Def. Ctr. v. Jeffreys*, 2022 WL 3107334, at *2 (N.D. Ill. 2022) (cleaned up); *see also Richard v. Pfister*, 2021 WL 3033543, at *3 (N.D. Ill. 2021).

Examples of systemic violations "include restrictions on library access, tampering with the mail system, inadequate recreation or nutrition, vermin infestations, and extreme hot or cold temperatures, among others." *Eason v. Pritzker*, 2020 WL 6781794, at *5 (N.D. Ill. 2020) (collecting cases).

Written communications can, in some instances, establish knowledge for a deliberate indifference claim. *See Love*, 2020 WL 1237200, at *6; *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (reversing grant of summary judgment where the plaintiff suggested that a defendant knew about his lack of access to scribe materials based on "the many letters" sent); *Perez*, 792 F.3d at 782 (concluding that the plaintiff sufficiently pleaded personal involvement against grievance officers by offering "highly detailed grievances and other correspondences").

"[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). A plaintiff must offer record evidence showing that the communications put

the defendant on notice of a constitutional violation, and that the defendant "turned a blind eye to it, failed to remedy it, or in some way personally participated." *Id.*

The plaintiff bears the burden of showing that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Id.* (cleaned up).

Defendants contend that nothing in the record supports personal involvement by Major Malkowski. *See* Defs.' Mem., at 5 (Dckt. No. 61). The Court agrees.

Major Malkowski wasn't on duty when the fires occurred. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 4, 16 (Dckt. No. 66). Minnifield sent Major Malkowski a letter after the first fire, complaining about the lack of fire alarms in X-House and asking to be moved to a different cell. *Id.* at ¶ 11.

Major Malkowski didn't respond to the letter. *Id.* at ¶ 12. In fact, no evidence in the record supports the notion that Major Malkowski *received* the letter. *See* Malkowski Decl., at ¶ 6 (Dckt. No. 60-5).

When it comes to Major Malkowski, the letter is the whole ballgame. Minnifield testified at deposition that the letter "was [his] only conversation to Malkowski and Gomez." *See* Minnifield Dep., at 27:7-8 (Dckt. No. 60-1); *see also id.* at 32:15-17 (Q: "And besides the letter did you have any interactions with Randy Malkowski?" A: "Not that I can recall.").

Minnifield only told Major Malkowski about fire safety issues through his letter. But no record evidence supports the idea that Major Malkowski received or read that letter. While Minnifield points out that he sent the letter, "[s]imply sending the letters is not enough to create a genuine issue of material fact." *Pitts v. Wills*, 2024 WL 836862, at *4 (S.D. Ill. 2024); *see also Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006), *overruled on other grounds by Hill v.*

18

*Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ("Critically, there is no evidence that Snyder actually read Johnson's communications or had any subjective awareness of Johnson's condition. . . . Thus, Johnson has not shown that Snyder personally facilitated, approved, condoned, or turned a blind eye to Johnson's situation."); *Banks v. Dart*, 2023 WL 6388063, at *4 (N.D. Ill. 2023) (opining that a "bare allegation" that a plaintiff wrote "unanswered letters" is not enough to support a claim for deliberate indifference). Sending a letter on Day 1, without more, cannot support an inference that someone else received it and read it on Day 2.

The evidentiary cupboard is bare. The record does not reveal how quickly mail is delivered within the prison. The record does not shed any light into how often Major Malkowski reads the mail, or how soon he reads it. Standing alone, evidence that Minnifield sent a letter in the prison mail system on January 8 is not enough to support a reasonable inference that Major Malkowski received it and read it by January 9.

Sending the letter does not support an inference of knowledge by Major Malkowski. Nothing in the record suggests that Major Malkowski knew about any fire safety problems at X-House. So, the Eighth Amendment claim against Major Malkowski fails.

Even if Major Malkowski had reviewed the letter, Minnifield's claim would still fail. The record does not contain evidence supporting the notion that Major Malkowski would have known about a constitutional violation from the letter.

"A plaintiff must demonstrate that, through the manner and content of his communication, he gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (cleaned up). After the inmate gives the prison official a heads-up about the substantial risk to health or

safety, the official's failure to act could constitute deliberate indifference. *Id.*; *see also Vance*, 97 F.3d at 993.

The record does not shed much light on the contents of Minnifield's letter. The record does not contain a copy of the letter. And no one besides Minnifield testified about the content of the letter.

At deposition, Minnifield answered a few questions about the letter. Minnifield testified that he asked to be moved to another unit because "there was still soot and everything on the wall." *See* Minnifield Dep., at 26:21 – 27:8 (Dckt. No. 60-1). He also testified that he wrote about the lack of water sprinklers and smoke alarms. *Id.* at 13:11-17.[2]

Minnifield testified about the letter at a high level of generality. But to establish personal involvement for a section 1983 claim, more detail is required. Minnifield provides too little detail about the letter to "permit the conclusion that the letter sufficiently advised the warden of the situation to require . . . intervention." *See Vance*, 97 F.3d at 994; *see also Robinson v. Pfister*, 2019 WL 4305527, at *6 (N.D. Ill. 2019) (dismissing section 1983 claims where plaintiff didn't provide "even a conclusory description" of his correspondence to prison administration).

To be sure, there's always *some* risk of a fire.[3] But Minnifield's letter – asking to change cells because of damage after a fire – would not have put Major Malkowski on notice about a

---

[2] In his brief opposing Defendants' motion for summary judgment, Minnifield wrote that he sent Major Malkowski a "detail[ed] letter voicing his concerns about the conditions, inadequate fire equipment, and fire hazards . . . ." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J. (Dckt. No. 66 at 69 of 83). However, Minnifield fails to offer record evidence providing details about the contents of the letter. On a motion for summary judgment, any factual assertions must be supported by record evidence. *See Allied Ins. Co. v. United States*, 627 F. Supp. 3d 944, 954 (N.D. Ill. 2022); *see also* Fed. R. Civ. P. 56(c). So, the Court will ignore Minnifield's unsupported assertions about what the letter said.

[3] As an aside, one has to wonder how serious the risk of fire is within a prison. The whole point of a prison is to keep people inside, and for that reason, prisons tend to be built with hard substances, like bricks and cinder blocks. Bricks and cinder blocks aren't flammable. Prisons aren't like homes – there isn't as much flammable material lying around. Prisons aren't likely to burn to ground. Even so, the Court understands that prisons contains flammable items, too. And smoke can pose a risk, even if there isn't much risk of the entire prison going up in flames.

"serious risk" of an inmate starting a fire the next day. *See, e.g.*, *Pitts*, 2024 WL 836862, at *5 ("Nothing in the letters, even if received by Warden Wills, would have put Wills on notice that he needed to intervene in Pitts's care."); *Bitzer v. Hyatte*, 2022 WL 426580, at *3 (N.D. Ind. 2022) (dismissing plaintiff's section 1983 claims where plaintiff sent letters after attacks occurred but did not explain why those letters would have provided "sufficient notice" about a need to protect him from future attacks); *Whaley v. Erickson*, 339 F. App'x 619, 622 (7th Cir. 2009) (concluding that an inmate's letter complaining about his cellmate's arguing and refusal to take medicine did not put the recipient on notice about a "substantial risk of serious harm" from the cellmate).

To top it off, inadequate fire safety procedures do not necessarily give rise to constitutional claims. "Actionable deviations tend to implicate multiple facets of fire safety, such as fire susceptibility, detection, evasion, and abatement." *Smith v. Godinez*, 2023 WL 358792, at *7 (N.D. Ill. 2023) (citing *Hadix v. Johnson* 367 F.3d 513, 528–29 (6th Cir. 2004)).

Here, Minnifield has offered evidence that X-House lacked fire extinguishers and sprinklers on the second floor. *See* Minnifield Dep., at 13:11-17 (Dckt. No. 60-1); *see also* Wynter Aff. (Dckt. No. 66, at 29 of 83). Additionally, the Upper West gallery had only one exit. *See* Gray Interrogatory Resp., at ¶ 6 (Dckt. No. 66, at 33 of 83). The conditions that Minnifield describes are not ideal from a fire safety perspective.

Still, the Constitution sets a floor, not a ceiling. The Constitution is a compact for self-governance, not a fire-safety manual. *See French v. Owens*, 777 F.2d 1250, 1257 (7th Cir. 1985) ("The eighth amendment does not constitutionalize the Indiana Fire Code."). In that vein, courts have concluded that similar conditions cannot support a triable claim about fire safety. *See, e.g.*, *Godinez*, 2023 WL 358792, at *7 (concluding that plaintiff had not "presented a triable

fire safety issue" despite voicing "reasonable" "concerns regarding the lack of fire abatement equipment" at Stateville); *Johnson v. Texas Bd. of Crim. Justice*, 281 F. App'x 319, 322 (5th Cir. 2008) (concluding that plaintiff's allegations about fire and electrical code violations failed to state a viable constitutional claim because he "did not allege that anyone had been injured by any type of fire or that [the prison] was built from flammable materials or was particularly susceptible to fires"); *Davis v. Oregon Cnty.*, 607 F.3d 543, 550 (8th Cir. 2010) (holding that "the jail's inoperable sprinklers and lack of extra fire equipment such as oxygen tanks" did not rise to the level of deliberate indifference).

While X-House's fire safety equipment was not to Minnifield's liking, the prison's measures appear to satisfy the constitutional baseline. *Cf. Wells v. Thieret*, 14 F.3d 605 (7th Cir. 1994) (affirming grant of judgment for defendant officers who "could have taken quicker and more effective safety measures to control the [inmates'] exposure to smoke" because "[m]ere negligence does not satisfy the deliberate indifference standard").

In sum, Minnifield has shown no personal involvement by Major Malkowski. Nothing in the record suggests that Major Malkowski received and read Minnifield's letter. More broadly, the record doesn't show that Major Malkowski knew about inadequate fire safety or a risk to Minnifield. The record does not support the notion that the conditions in the prison ran afoul of constitutional limits. Thus, Minnifield's deliberate indifference claim against Major Malkowski is dismissed.

## II.    The Deliberate Indifference Claim Against Lieutenant Gray

The second claim is Minnifield's Eighth Amendment claim against Lieutenant Gray. The claim involves a theory that Lieutenant Gray failed to protect Minnifield from violence at the hands of another inmate (*i.e.*, Young).

Defendants argue that the claim fails on the merits. *See* Defs.' Mem., at 7–11 (Dckt. No. 61). They also assert that Lieutenant Gray is entitled to qualified immunity. *Id.* at 11–12. The Court will address the arguments in that order.

## A. The Merits

"[I]n order to state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was 'incarcerated under conditions posing a substantial risk of serious harm' and (2) that the defendants acted with 'deliberate indifference' to his health or safety." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (citing *Farmer*, 511 U.S. at 834).

Defendants do not contest that Minnifield faced a substantial risk of harm because of the risk that another inmate could start a fire. *See* Defs.' Mem., at 8 (Dckt. No. 61). They think that Minnifield's claim fails on the second prong (meaning deliberate indifference). *Id.*

It is difficult for a plaintiff to show that a defendant acted with deliberate indifference. When it comes to deliberate indifference, the bar "is low" for defendants, and high for plaintiffs. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 566 (7th Cir. 2021). "Deliberate indifference is more than mere negligence or carelessness: it is 'something approaching a total unconcern' for inmate safety." *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (citations omitted); *see also Ayoubi v. Dart*, 724 F. App'x 470, 474 (7th Cir. 2018) ("[M]ere negligence in managing a health or safety crisis does not add up to 'deliberate indifference' in violation of the constitution."). A correctional official is deliberately indifferent only if he "effectively condones the attack by allowing it to happen." *Santiago*, 599 F.3d at 756 (quoting *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997)).

"[T]he official must have actual, and not merely constructive, knowledge of the risk in order to be held liable." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). "This

23

requires that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) (cleaned up). A factfinder can infer that a substantial risk exists "from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842).

In Defendants' view, Minnifield hasn't shown that Lieutenant Gray was subjectively aware of any serious risk of harm posed by Young's threats to start a fire. *See* Defs.' Mem., at 10 (Dckt. No. 61).

Taking Minnifield's version of events as true, Young asked Lieutenant Gray for a crisis team and threatened to burn X-House down. *See* Minnifield Dep., at 12:8-12 (Dckt. No. 60-1); Wynter Aff. (Dckt. No. 66, at 29 of 83).

A request for a crisis team, standing alone, isn't enough to put a correctional officer on notice of a substantial, imminent risk. *See, e.g.*, *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (concluding that a request to see a crisis counselor was insufficient to show that the inmate was at substantial risk of committing suicide); *Johnson v. Garant*, 786 F. App'x 609, 610 (7th Cir. 2019) ("[A] reasonable jury could not find that the defendants knew of a substantial risk of suicide based only on [the plaintiff's] statements that he felt suicidal and wanted to speak to a crisis counselor."); *Lyons v. Wills*, 2024 WL 1285436, at *4 (S.D. Ill. 2024) (denying an inmate access to a crisis team member does not indicate awareness of a substantial risk of harm); *Podkulski v. Williams*, 2022 WL 991963, at *6 (N.D. Ill. 2022) (opining that a corrections officer can decline to provide a crisis team when an inmate expresses suicidal thoughts without being deliberately indifferent).

In a similar vein, courts have declined to attribute actual knowledge of a substantial risk to defendants simply based on prisoners' complaints about mental health. *See, e.g.*, *Est. of*

*Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) ("Mere knowledge that an inmate is behaving violently or 'acting in a "freaky" manner' is not sufficient to impute awareness of a substantial risk of suicide."); *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) (declining to "impute actual knowledge of [the decedent's] risk of suicide to the defendants" when the decedent was distressed about his father's death and expressed unhappiness about being transferred to a high-security prison wing); *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (concluding that the plaintiff's "scant comments" that his family members had died by suicide and that he was receiving treatment for depression did not show he should be put on suicide watch absent "more or more significant indirect signs"); *Crawford v. Pfister*, 2022 WL 767124, at *4 (N.D. Ill. 2022) (concluding that no rational jury could find that the plaintiff's complaints about "hearing voices" made the defendant "cognizant of the significant likelihood" that the plaintiff would kill himself).

Besides, even if Lieutenant Gray heard Young's threats, he did not need to take them at face value. Sometimes, prisoners lie. For that reason, prison officials don't need to believe everything that inmates say. *See Goetsch v. Ley*, 444 F. App'x 85, 88–89 (7th Cir. 2011) ("[P]rison officials are not required to believe everything inmates tell them, even when the topic is suicide[.]"); *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) ("[P]rison guards are neither required nor expected to believe everything inmates tell them.").

The evidence does not suggest that Lieutenant Gray took Young's threats seriously. Nothing in the record indicates that Lieutenant Gray subjectively believed that Young planned to burn X-House to the ground.

In fact, Minnifield's own testimony belies this point. Minnifield testified that, after he told Lieutenant Gray to get Young a crisis team, Gray replied, "he don't need one, he's straight,

he don't need anyone, he's just talk." *See* Minnifield Dep., at 12:24 – 13:1 (Dckt. No. 60-1).

Minnifield continued asking for help, and Lieutenant Gray said, "you're all right, you're going to

be okay, he's only talking." *See id.* at 13:7-8; *see also id.* at 29:23 (quoting Lieutenant Gray as

saying, in response to Minnifield's request for Young to get a crisis team, "He don't need one.

He's all right").

Based on Minnifield's testimony, Lieutenant Gray did not appear to know about a serious

risk. *Cf. Lord v. Beahm*, 952 F.3d 902, 905–06 (7th Cir. 2020) (opining that an Eighth

Amendment claim does not lie when a prison official "ignore[s] an inmate who . . . voic[es] an

idle threat of suicide"). Failure to know about the risk does not suffice for an Eighth

Amendment claim. *See Sanville v. McCaughtry*, 266 F.3d 724, 735 (7th Cir. 2001) (explaining

that failure to respond to a risk that the correctional officer doesn't know about does not

constitute a "punishment" under the Eighth Amendment jurisprudence).

Overall, the record doesn't shed much light on what (if anything) Lieutenant Gray knew

about Young. The record lacks Young's first name, and it doesn't include much other

information about him, either.

For example, the record does not shed light on whether Young had requested a crisis

team in the past. It does show that Young refused to see a crisis counselor two hours before

setting the fire. *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6). However, the record doesn't

shed light on whether Young had seen a crisis counselor in the past – or on whether he had

improperly requested one. *Cf. Collins*, 462 F.3d at 761 (pointing to record evidence indicating

that inmates had sometimes requested crisis teams as a tactic to manipulate prison guards).

For a non-medical professional like Lieutenant Gray, determining whether a prisoner's

mental health poses a realistic threat is no easy feat. *See Quinn*, 8 F.4th at 569 (opining that

"[m]ental health is notoriously difficult to assess and treat"). The record does not contain evidence about whether Young had previously threatened to harm himself or others. It lacks evidence that Young previously set fires.

Nothing in the record suggests that Lieutenant Gray should have taken Young's threat to start a fire seriously based on past events. *Cf. Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006) (concluding that genuine issue of fact existed where plaintiff had "threatened and attempted suicide on several occasions in the past"); *Washington v. LaPorte Cnty. Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002) (rejecting deliberate indifference claim based on attack by another inmate given a lack of evidence that "prison officials should have expected an attack" based on past events).

While another inmate started a fire the day before, that incident wouldn't have alerted Lieutenant Gray to a specific risk of *Young* starting a fire. *Cf. Fisher v. Lovejoy*, 414 F.3d 659, 663–64 (7th Cir. 2005) (explaining that an initial attack did not put an officer on notice about a forthcoming second attack); *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (similar).

In a similar vein, nothing in the record suggests that Lieutenant Gray knew that Young had easy access to items with which he could start a fire. Imagine that Young was holding a canister of gasoline in one hand, and a box of matches in the other, when he asked Lieutenant Gray for a crisis team. Those facts could support an inference that Lieutenant Gray subjectively knew about an active threat.

But nothing in the record suggests that Lieutenant Gray saw or heard about specific items that Young could use to light the cell ablaze. *Cf. Garant*, 786 F. App'x at 610 (opining that "the presence of common items in [the plaintiff's] cell" that could be set on fire did not suggest a risk

of starting a fire); *Wiegand v. Turck*, 2023 WL 3170183, at \*6 (E.D. Wis. 2023) (noting that defendants lacked knowledge that plaintiff had a razor with which he could harm himself).

The record does not contain evidence about Young's mental health history, either. So, the Court does not know whether Young had previously expressed suicidal or homicidal tendencies. More importantly, the record does not shed light on whether *Lieutenant Gray* knew whether Young had any mental health issues.

If Young did have suicidal or homicidal tendencies – and Lieutenant Gray knew about them – those tendencies might support an inference that Lieutenant Gray didn't do enough. *Cf. Sanville*, 266 F.3d at 737–38 (concluding that officials were on notice that an inmate's suicide threats were not idle given that the officials knew about the inmate's history of suicide attempts, the inmate prepared a last will and testament, and the inmate's mother called the prison to inform officials that her son was suicidal); *Wright v. Funk*, 853 F. App'x 22, 24 (7th Cir. 2021) (affirming grant of summary judgment on deliberate indifference claim – despite the plaintiff's history of mental health issues – given that nothing in the record showed that the defendants knew about the plaintiff's history). But the record here does not support that inference.

Overall, the record does not shed much light on what, if anything, Lieutenant Gray knew about Young. Nothing in the record suggests that Lieutenant Gray knew about a real risk, and nothing in the record suggests that the risk of Young starting a fire would have been "obvious" to Lieutenant Gray. *See LaBrec*, 948 F.3d at 841; *see also Matos*, 335 F.3d at 557.

Lieutenant Gray's response to the fire also tends to suggest that he lacked the mindset required to support a deliberate indifference claim. After learning about the fire, Lieutenant Gray acted promptly to secure a fire extinguisher and evacuate the inmates from their cells on

28

Upper West. *See* 1/9/20 Incident Report, at 1 (Dckt. No. 60-6). Lieutenant Gray also made sure that the inmates obtained medical care. *Id.*

Minnifield concedes that Lieutenant Gray acted reasonably in response to the fire. *See* Pl.'s Mem. (Dckt. No. 66, at 77 of 83). But he believes that "it's not relevant . . . how defendant Gray acted during or after the fire was set[.]" *Id.*

The Court disagrees. Evidence that Lieutenant Gray responded reasonably to the fire speaks to his state of mind. Lieutenant Gray didn't sit on his hands after learning about the fire – instead, he acted quickly to remove the threat. *Cf. Wright*, 853 F. App'x at 24 (considering, on the subjective prong, the fact that officers quickly transported plaintiff to a hospital after he reported that he had taken 50 pills); *Washington*, 306 F.3d at 518–19 (opining that prison guards' immediate action in response to attack on inmate "display[ed] deliberate care, not deliberate indifference"). Lieutenant Gray's post-fire actions don't mesh with an inference of "total unconcern" for inmate safety. *See Hunter*, 73 F.4th at 566.

Maybe Lieutenant Gray did not take the most prudent available course of action. Maybe he could have prevented the fire by obtaining a crisis team for Young. Nonetheless, officers like Lieutenant Gray can "escape liability even if they did not take perfect action." *Rosario v. Brawn*, 670 F.3d 816, 821–22 (7th Cir. 2012). A reasonable jury could not conclude that Lieutenant Gray "effectively condone[d]" the fire. *See Santiago*, 599 F.3d at 756.

At most, the record suggests that Lieutenant Gray acted negligently (and even that's a stretch). But negligence does not satisfy the subjective prong for a deliberate indifference claim. *See Collins*, 462 F.3d at 762 (opining that deliberate indifference requires "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks); *see also Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 445 (7th Cir. 2009) ("A certain amount of

29

negligence is unavoidable . . . .") (citation omitted); *Quinn*, 8 F.4th at 566 (opining that "poor" and "negligent" decisions by prison staff do not give rise to an Eighth Amendment claim).

Unfortunately for Minnifield, the consequence of the gap in evidence is that there's no genuine issue of material fact. *See Quinn*, 8 F.4th at 567. In other words, there is nothing in the record to suggest that Lieutenant Gray *was* deliberately indifferent to a known risk. The murky record leaves the factfinder with no facts from which to infer that Lieutenant Gray was deliberately indifferent.

In sum, the record does not include any evidence suggesting that Lieutenant Gray was deliberately indifferent to a serious risk of Young setting a fire. Minnifield thus cannot satisfy the subjective prong for his failure to protect claim. Therefore, the Court grants Defendants' motion for summary judgment.

### B. Qualified Immunity

Defendants believe that Lieutenant Gray is entitled to qualified immunity. *See* Defs.' Mem., at 11–12 (Dckt. No. 61).

Because the Court is granting Defendants' motion for summary judgment on the merits, the Court need not address the qualified immunity defense. *See Johnson v. Clark*, 2022 WL 971997, at *7 (N.D. Ill. 2022) (declining to address defendants' qualified immunity defense after granting summary judgment on the merits); *Jackson v. Vasquez*, 2023 WL 319530, at *7 n.7 (N.D. Ill. 2023) (same); *Willis v. Pfister*, 2024 WL 216672, at *16 (N.D. Ill. 2024) (same).

The Court therefore declines to address Defendants' argument about qualified immunity.

\*        \*        \*

30

One final note.  Minnifield encountered two fires in two days.  That's a scary experience for anyone to endure.  And the suffering is worse for someone who is trapped in a cell, unable to escape on their own.

The Court does not mean to suggest that Stateville's fire procedures are exemplary, either.  Minnifield has identified potential flaws in the fire safety systems at X-House (and areas for improvement).

The Court concludes that no reasonable jury could find a constitutional violation based on this record.  But nothing in this ruling is meant to detract from the seriousness of the situation.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is hereby granted.

Date:   July 1, 2024

Steven C. Seeger
United States District Judge